**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

STEVEN M. SEVERE,

        Plaintiff,

vs.

O'REILLY AUTOMOTIVE STORES,
INC.,

        Defendant.

No. C13-3055-LTS

**MEMORANDUM OPINION AND
ORDER ON DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

---

## *TABLE OF CONTENTS*

I.     *INTRODUCTION* .................................................................... 2

II.    *PROCEDURAL HISTORY* ...................................................... 2

III.   *RELEVANT FACTS* ............................................................... 3

IV.   *SUMMARY JUDGMENT STANDARDS* ................................. 10

V.    *ANALYSIS* ........................................................................... 13

    A.   *Age Discrimination* ..................................................... 13
        1.  *Applicable Standards* ............................................. 13
        2.  *Discussion* .............................................................. 15
            a.  *Who made the decision to terminate, and when?* .. 16
            b.  *Would Severe have been discharged solely
               because of the Trickle Pay Arrangement?* .......... 20
            c.  *Martin's alleged role* .................................... 22
    B.   *FMLA Discrimination* ................................................ 25
        1.  *Applicable Standards* ............................................. 25
        2.  *Discussion* .............................................................. 26

VI.   *CONCLUSION* ...................................................................... 27

## I.    INTRODUCTION

This case is before me on a motion (Doc. No. 22) for summary judgment filed by defendant O'Reilly Automotive Stores, Inc. (O'Reilly).  Plaintiff Steven Severe (Severe) has filed a resistance (Doc. No. 28) and O'Reilly has filed a reply (Doc. No. 33).  I heard oral arguments on February 20, 2015.  Patrick Smith appeared for Severe while Thomas Cunningham and David Bower appeared for O'Reilly.  The motion is now fully submitted and ready for decision.

## II.    PROCEDURAL HISTORY

Severe commenced this action by filing a petition and jury demand in the Iowa District Court for Hamilton County.  O'Reilly filed a notice (Doc. No. 1) of removal to this court on October 16, 2013.  Severe then filed an amended complaint and jury demand (Doc. No. 4) on October 23, 2013.  In his complaint, as amended, Severe contends that he was employed by O'Reilly until he was unlawfully discharged due to his age and his use of medical leave.  He asserts the following causes of action:

| | |
|---|---|
| Count I: | Age discrimination in violation of the Iowa Civil Rights Act (ICRA) |
| Count II: | Age discrimination in violation of the Age Discrimination in Employment Act (ADEA) |
| Count III: | Discrimination in violation of the Family and Medical Leave Act (FMLA)[1] |

Doc. No. 4.  O'Reilly denies Severe's operative factual allegations, denies liability and asserts various affirmative defenses.  Doc. No. 6.  This case was referred to me after the parties consented to trial, disposition and judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(3).  Doc. No. 7.  Trial is scheduled to begin May 4,

---

[1] Severe's amended complaint also describes a claim for interference with FMLA rights.  Doc. No. 4 at ¶¶ 96-97.  Severe concedes that "the evidence revealed in discovery does not support an interference claim."  Doc. No. 28-2 at 20.  As such, O'Reilly's motion for summary judgment on the FMLA interference claim will be granted without further discussion.

### III.    RELEVANT FACTS

Except as otherwise noted, the following facts are not in dispute:

**Background.**  O'Reilly is a Missouri corporation that operates over 4,000 retail auto parts stores throughout the country.  Severe was born March 25, 1952, and was employed by O'Reilly from January 1999 until November 2012.  Severe previously owned a company that operated three auto parts stores in Iowa.  O'Reilly purchased Severe's Webster City, Iowa, store in January 1999.

O'Reilly organizes its retail stores into Districts, Regions and Divisions.  There are over four hundred Districts, which are comprised of a number of retail stores all located in a particular geographic area.  Each District is overseen by a District Manager. There are over fifty Regions, which include a number of Districts. Each Region is overseen by a Region Director.  Each District Manager reports to his or her respective Region Director.  There are eight Divisions encompassing a number of Regions.  Each Division is overseen by a Division Vice President.  Each Region Director reports to his or her respective Division Vice President.  The O'Reilly store in Webster City is, and has been since its acquisition, located in District 22.  Since Severe began his employment with O'Reilly, District 22 has been located in Region 7.  Region 7 has been a part of the Northern Division since 2006.

**Severe's Employment History.**  When O'Reilly purchased Severe's Webster City store, it hired him to serve as that store's manager.  In November 1999, Severe was promoted to District Manager for District 22, a position he held until his discharge in November 2012.  Severe continued to live in Webster City and used the Webster City store as the District Office.  During his tenure as District Manager, District 22 grew from about eight stores to thirteen, all located in north central Iowa.

Severe reported to three different Region 7 Directors during his employment: (1) Allen Alexander through late 2005, (2) Billy Harris from approximately October 2005 through the end of 2008 and (3) Chris Lewis from early 2009 through November 30, 2012.  Ken Martin has been the Division Vice President for the Northern Division since 2006, with the exception of a one year period in 2009 and 2010.

*Martin's Promotion Recommendations*.  During the time Martin was Division Vice President, every candidate he recommended for promotion from District Manager to Region Director was, in fact, promoted.  O'Reilly maintained "high potential" lists of potential candidates for various positions and Severe was on the "high potential" list for promotion to Region Director.  In 2008, Martin interviewed Severe for a Region Director position.  However, Martin had already decided, before the interview, that Severe would not be chosen for the position.  Martin did not consider Severe for any other Region Director positions.   Instead, Martin recommended five other District Managers for promotion to Region Director during the relevant period of time.   One of the recommended District Managers was not on the "high potential" list.  Each of the five were considerably younger than Severe, ranging from 13 to 27 years younger than Severe at the time of their respective promotions.  The District Managers recommended for promotion by Martin were 29, 35, 40, 40 and 42 years old, respectively, when they were promoted, while Severe was in his mid-50's.  Severe relies on these undisputed facts to allege that Martin improperly took age into account when making promotion recommendations.   O'Reilly denies this allegation and cites various facts suggesting otherwise.  For example, O'Reilly's records indicate that Severe was not willing to relocate and Martin testified that he believed this to be true.  Severe denies that he advised O'Reilly that he was not willing to relocate.

*Storm Lake Store Events*.  The Storm Lake store was part of District 22, which Severe managed.  In October 2012, the store's manager and assistant manager resigned within days of each other.  The store manager indicated he was leaving O'Reilly in order to open an auto parts store that would be in direct competition with O'Reilly.  Severe

4

alerted Lewis of this situation on October 28, 2012. Lewis determined that O'Reilly would need to accept the store manager's resignation in full by October 31, 2012, due to his intention to open a competing business.

On October 30 and 31, 2012, Severe took sick days. Lewis sent Severe an email on October 31, 2012, concerning the staffing of the Storm Lake store. Lewis proposed a plan that included Severe assuming management duties for that store on an interim basis the following week until a new management team could be put in place. Lewis suggested that Severe may have to fill this interim role for about one month. During that time, Severe would have been actively involved with sales and the day-to-day operations of the store until new staffing arrangements were made.

Lewis called Severe later in the evening on October 31, 2012, to follow up on the email and discuss the plan for the Storm Lake store. After the conversation ended, Lewis documented it in a memo. According to that memo, Lewis told Severe he expected him to serve as the store manager and Severe became very upset and complained about being "micro-managed." The memo states Severe told Lewis "he had spent a lot of years in front of the customer working the counter, and that he was beyond that now," and that if Lewis expected him to run the Storm Lake store he would give Lewis his resignation.

The memo further states that Lewis asked Severe if he "was drawing a line in the sand," to which Severe responded that Lewis could call it what he chose but Lewis would have "13 more stores to run" if he expected Severe to run the Storm Lake store. After further discussion, Lewis told Severe he was expected to run the Storm Lake store. Severe finished the conversation by telling Lewis he would call back in the morning after discussing the plan with his wife. Severe testified that he does not remember this conversation, including whether he told Lewis he would resign.

After the conversation, Lewis called his supervisor, Martin, to report what had happened. Martin instructed Lewis to contact Jon Stahl, the Region's Human Resources Manager. Martin also asked Lewis to set up a conference call between Severe, Martin and Lewis. Martin then sent an email message to his supervisor, Vice President of Sales

and Operations Jeff Shaw, to report the situation. Lewis spoke with Stahl that same evening and forwarded him the email he sent to Severe earlier in the day. Stahl responded by saying "I think the best bet is to wait for him [Severe] to call you in the morning. The ball is in his court right now."

*Severe's Medical Leave.* The next day, which was November 1, 2012, Severe took another sick day and let Lewis know he would be visiting his doctor later that afternoon. Lewis responded that he hoped Severe felt better and indicated that Martin wanted to set up a conference call. Severe suggested November 2, 2012, would be better for him. Severe, Lewis and Martin then had a conference call on the morning of November 2, at which time Severe informed Lewis and Martin that his physician had instructed him to take two weeks off from work. Martin told Severe that it was fine to take time off, that he wanted Severe to get better before he returned to work and that O'Reilly would make whatever accommodations were necessary at the Storm Lake store.

Severe then faxed a note from his physician to Lewis, which Lewis forwarded to Human Resources with a cover letter stating:

> Here is the doctor's note requesting Steve Severe be off work for a minimum of 2 weeks. I contacted Steve, and he will be expecting the LOA Packet to be sent to him. Please let me know if you need anything from my end.

O'Reilly mailed Severe a letter on November 7, 2012, explaining his rights under the FMLA and enclosing a "Leave of Absence" application. On November 14, 2012, Severe was placed on FMLA leave with an effective date of October 31, 2012. An email was sent to District and Corporate Management on November 2, 2012, announcing Severe would be out on a leave of absence and Lewis would be acting as the interim District Manager for District 22 until Severe's return.

After the conference call on November 2, 2012, Martin directed an email message about the situation to his supervisor, Shaw, and to three top O'Reilly executives: Ted Wise, Co-President and Chief Operating Officer, Greg Henslee, Chief Executive Officer,

and Phyllis Evans, Vice President of Administration. The next day, Wise responded with an email message to Martin stating:

> Kenny, how has Steve been doing in the DM job leading up to this incident? I know Steve has always been temperamental, but thought he was pretty [dedicated] and got good results from his stores. I have known Steve for a long time and would like to call him at the appropriate time if it's ok with you. It's a shame to lose a long term manager like Steve which knows his market so well, unless we are having performance issues.

Martin responded the same day, identifying some concerns with Severe's recent performance but stating that Severe "has done a lot for the company and I want to give him every opportunity" and that "maybe this sabbatical will refresh him and he can come back and redeem himself." Wise responded by stating that the company may be better off if Severe elected to resign. Henslee responded by expressing agreement with Wise's assessment. Martin then forwarded the entire email chain to Lewis with the comment "FYI."

On November 16, 2012, Severe called Lewis and indicated his physician had recommended he take an additional two weeks off from work. Severe provided Lewis with a second note from his physician that day, which stated that Severe would be unable to return to work until the end of November. Lewis forwarded this note to the Human Resources department on November 19, 2012, with a cover letter to the same effect.

***The Delbert Trickle Pay Arrangement***. During Severe's medical leave, Lewis served as the interim District Manager and assumed Severe's day-to-day duties. Delbert Trickle was an employee of the Ames, Iowa, store at this time. Trickle had a pay arrangement under which he was paid for thirty-six hours each week but only worked eighteen hours (the Trickle Pay Arrangement). This arrangement had been in place since 2004. Severe contends that his Region Director at the time, Alexander, approved the Trickle Pay Arrangement. He further contends that he advised Alexander's successor, Harris, about that arrangement. However, Severe admits that he did not tell Harris's

successor, Lewis, about the arrangement. Nonetheless, Severe denies that there was anything secret about the Trickle Pay Arrangement and notes that various store managers of the Ames store were necessarily informed of the arrangement during its eight-year existence.

On or about November 19, 2012, Lewis had a conversation with the then-current store manager in Ames, Jeremy Mobley, regarding Mobley's request to add additional staff to that store. Lewis learned of the Trickle Pay Arrangement during this conversation. It appears to be undisputed that this was, in fact, Lewis's first notice of that arrangement.

*The Loss Prevention Investigation*. The O'Reilly Loss Prevention Policy provides:

> It is our policy that all fraud, theft, business abuse or other forms of loss, confirmed or suspected, be reported to the Loss Prevention Department to be investigated. At the moment intentional loss or fraud is suspected, it is required that Team Members stop their own investigation and contact the Loss Prevention department immediately.

The Loss Prevention Policy further states "it is required that every team member conduct themselves in a way that minimizes the loss of company profits," and gives examples of several of the "more serious violations" including "falsifying company documents in order to cover up the misappropriation of company assets."

Lewis called Martin to report his discovery of the Trickle Pay Arrangement. Martin instructed Lewis to contact the Loss Prevention Department. Lewis called Division Loss Prevention Manager Steve Dube who, in turn, called his supervisor, Vice President of Loss Prevention Barry Sabor. Sabor determined that the situation required a loss prevention investigation and directed Dube to conduct it. Dube interviewed Trickle, Mobley and Rodney Thomas, a former manager of the Ames store. Each employee confirmed the existence of the Trickle Pay Arrangement and Severe's involvement in its creation and perpetuation.

In a written statement, Thomas claimed he was "instructed by Steve Severe District Manager" to pay Trickle for seventy-two hours per pay period because "we couldn't pay him what he wanted so this was the only way around it. I was supose [sic] to take his time sheet off so no one would see it as well so not to upset other employees." Thomas explained the rationale behind the arrangement was that Trickle provided access to customers to which the Ames store allegedly would not have access otherwise. In his written statement, Mobley stated Trickle was "to work Monday through Thursday, 730 – 1200 (18 hrs/wk) and be compensated at 36 hours per week. This was a preexisting arrangement before I took over as manager of Store 740 and I was directed to continue in this fashion per my DM Steve Severe."

Dube called Sabor after the interviews and read him the written statements provided by Trickle, Mobley and Thomas. Sabor then told Dube to interview Severe. Dube informed Sabor that Severe was on leave. Sabor suggested that Dube contact Human Resources to find out if it was appropriate to request an interview with Severe while he was on leave. Dube did so and was advised that he could ask Severe to come in for an interview so long as he was paid for his time. On November 29, 2012, Dube interviewed Severe at the Webster City store. Lewis was present as well and the interview was recorded.

During the interview, Severe acknowledged that the Trickle Pay Arrangement was in place and that it had been his decision. Severe explained that the arrangement was put in place in order to retain Trickle as an employee. However, when Dube requested that Severe provide a written statement, Severe refused. O'Reilly Loss Prevention Policy requires that team members provide truthful and complete written statements when asked.

***Severe's Termination***. After the interview with Severe on November 29, 2012, Dube called Sabor and provided a report. Sabor directed Dube to terminate Severe's employment. On November 30, 2012, Dube called Severe and advised him of that decision. Dube did not tell Severe the reason for discharge.

Additional facts will be discussed as necessary during the analysis of specific claims.

## IV.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of

the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

No unique summary judgment standards apply to employment discrimination cases. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (en banc) (rejecting prior decisions that applied a "discrimination case exception" to the analysis of summary judgment motions). However, as Judge Bennett recently explained, applying summary judgment standards to the motivation-intensive elements present in most employment discrimination cases is not a simple task:

> Employment discrimination and retaliation, except in the rarest cases, are difficult to prove. They are perhaps more difficult to prove today—fifty years after the passage of the EPA, more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the

ADA, and nearly two decades after the passage of the FMLA—than during the earlier evolution of these anti-discrimination and anti-retaliation statutes. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697–98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, the EPA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* On the other hand, it is also relatively easy for disgruntled former employees to claim a protected basis under federal and state anti-discrimination laws as a reason for their discharge when in fact they played no part. This is true even when the former employee and/or their counsel believe they did. This is what makes deciding these issues on a paper record daunting.

*Pick v. City of Remsen,* No. C13-4041, 2014 WL 4258738, at *12 (N.D. Iowa Aug. 27, 2014). While the task can indeed be daunting in an employment discrimination case, "the focus of inquiry at the summary judgment stage 'always remains on the ultimate

question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic].'" *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1018 (8th Cir. 2005) (quoting *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1336-37 (8th Cir. 1996)).

## V.     ANALYSIS

As noted above, Severe asserts claims under federal and Iowa law that he was discharged unlawfully due to his age.  He also asserts a claim that he was discharged because he used FMLA leave.  I will address the age-discrimination and FMLA-discrimination claims separately.

### A.     Age Discrimination

#### 1.     Applicable Standards

The ADEA and the ICRA prohibit discrimination against employees because of age.  29 U.S.C. § 623(a); Iowa Code § 216.6.  Absent direct evidence of discrimination, age discrimination claims are analyzed under the *McDonnell-Douglas*[2] burden-shifting framework.  *Holmes v. Trinity Health*, 729 F.3d 817, 811 (8th Cir. 2013); *Hulme v. Barrett*, 449 N.W.2d 629, 631-32 (Iowa 1989).  The Eighth Circuit describes the *McDonnell-Douglas* framework, as applied to ADEA and ICRA claims, as follows:

> At the first step of the analysis, the plaintiff has the burden of establishing a prima facie case of age discrimination. . . .  A successful showing creates a presumption that the employer unlawfully discriminated against the plaintiff and shifts the burden to the burden to the employer to articulate a legitimate nondiscriminatory reason for its actions. . . .  If the employer meets this burden, the presumption of discrimination dissolves and the burden returns to the plaintiff to demonstrate

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> that the proffered reason is a mere pretext for age discrimination.

*Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013) [citations omitted]. At the summary judgment stage, a plaintiff must point to "enough admissible evidence to raise a genuine doubt as to the legitimacy of the defendant's motive, even if that evidence does not directly contradict or disprove the defendant's articulated reasons for its actions." *Wierman v. Casey's General Stores*, 638 F.3d 984, 995 (8th Cir. 2011) (pregnancy discrimination claim). Proof of this pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact as to whether the termination was motivated by intentional discrimination. *Burton v. Arkansas Sec. of State*, 737 F.3d 1219, 1230 (8th Cir. 2013) (race discrimination claim).

Pretext can be established by (1) "persuading the court that a discriminatory reason more likely motivated the employer," *Jones v. Nat'l Am. Univ.* 608 F.3d 1039, 1046 (8th Cir. 2010), (2) "showing that the employer's proffered reason is unworthy of credence," *id.*, (3) showing that it was unlikely an employer would have acted on the basis of the proffered reason," *Ridout*, 716 F.3d at 1084, (4) showing the proffered reason was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case, *id.*, or (5) presenting evidence that the employer's proffered reason has changed substantially over time. *Jones*, 608 F.3d at 1046.

A plaintiff may also show pretext through "comparator evidence," which involves showing that a younger employee, similarly situated to plaintiff, was treated more leniently when he or she committed an infraction of comparable seriousness. *Ridout*, 716 F.3d at 1084-85. The comparator employee need not have engaged in the exact same offense, only one of "comparable seriousness." *Id.* Where evidence demonstrates that the comparator employee was disciplined differently, a factfinder may decide whether the different treatment is attributable to discrimination or some other cause. *Id.* Regardless of how the plaintiff shows pretext, the showing requires more than merely discrediting an employer's asserted reasoning for terminating an employee. *Haigh v.*

14

*Gelita USA, Inc.*, 632 F.3d 464, 470 (8th Cir. 2011). A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus. *Id.*

Under the ADEA, a plaintiff must show that age was a "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). Under the ICRA, a plaintiff must only show that age "played a part" in the adverse employment decision and need not prove age was the only reason. *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 982 (8th Cir. 2010) (citing *DeBoom v. Raining Rose Inc.*, 772 N.W.2d 1, 13 (Iowa 2009)).

### 2. *Discussion*

For purposes of O'Reilly's motion, the parties agree that Severe has established a prima facie case under the ADEA and ICRA and that O'Reilly has articulated a legitimate, non-discriminatory reason for termination. Therefore, the key question is whether Severe has raised a genuine issue of material fact as to whether O'Reilly's proffered reason for termination is a mere pretext for age discrimination.

On this issue, timing is a critical factor. O'Reilly contends that the decision to terminate Severe's employment was made by Sabor – and Sabor alone – on the evening of November 29, 2012, after he received Dube's report about the loss prevention interview. O'Reilly denies that Sabor received input or direction from Martin or any other O'Reilly executives and contends that he made the decision solely because of the Trickle Pay Arrangement. As such, any evidence allowing an inference that the termination decision was actually made prior to November 29, 2012, would contradict O'Reilly's position and cast doubt on its explanation. For example, while Sabor's testimony is consistent with O'Reilly's position, he acknowledged that if the termination decision was made before November 29, then it was not made by him.

By contrast, if it is true that Sabor made the decision without input or influence from Martin or other executives, and that he did so after the loss prevention interview on November 29, 2012, Severe's age discrimination claims must fail. Severe acknowledges

there is no evidence that Sabor had any age-related animus.  Thus, if there is no evidence from which a jury could infer that O'Reilly's position concerning the circumstances of the termination decision is untrue, O'Reilly is entitled to summary judgment.

At this stage, in light of the standard by which I must view the evidence, I conclude there is sufficient admissible evidence to raise a genuine issue of material fact on the issue of pretext.  I could grant O'Reilly's motion only by believing its witnesses, accepting its explanations of various events and drawing inferences in its favor rather than Severe's.  That, of course, would be improper.  I will discuss the various genuine, material factual disputes below.

### a.    Who made the decision to terminate, and when?

Severe claims the decision to terminate his employment was actually made on or before November 28, 2012.  Severe relies on the following evidence:  (a) the pay period dates shown on his final paycheck and a separate paycheck issued for the investigation interview in which he participated, (b) statements allegedly made to him by an O'Reilly payroll employee, (c) statements made by Dube, (d) O'Reilly's alleged noncompliance with its standard loss prevention investigation procedures and (e) statements made by Sabor.  Severe also claims if the termination decision was made prior to November 29, 2012, then a reasonable jury could conclude that Martin – who allegedly had an age bias – was involved in the process and that Severe's age motivated the decision.

***Paychecks.***  Severe's final paycheck from O'Reilly, which was issued December 7, 2012, shows that he was paid only through November 28, 2012, not November 29, 2012.  P. App. 110.  However, on November 30, 2012, the date Severe was notified of the termination decision, O'Reilly issued a special check to pay him for November, 29, 2012, the day he reported to the Webster City store for the loss prevention interview.  Severe contends these circumstances show that his actual termination date was November 28, 2012, and that the separate check for November 29, 2012, was then issued to

corroborate O'Reilly's claim that the decision did not occur until the evening of November 29.

O'Reilly counters by explaining that Severe was paid in this manner because he was on FMLA leave and was receiving sick pay at the time of the relevant events. O'Reilly states that when employment terminates, the employee receives his or her final paycheck on the next regular payday, which in this case was December 7, 2012. According to O'Reilly, the situation was complicated by the fact that Severe actually attended work on November 29, 2012, for the loss prevention interview. Because Severe was a salaried employee, he was entitled to be receive his regular pay for that entire day. Thus, O'Reilly says, a special one-day check, for regular pay, was issued for that date while Severe's final paycheck included sick pay through November 28, 2012.

O'Reilly's explanation could very well be true, but the circumstances are sufficiently unusual as to allow reasonable jurors to have doubts. O'Reilly has not explained, for example, why the final paycheck, issued in the ordinary course on December 7, 2012, could not have included both (a) sick pay through November 28, 2012, and (b) regular pay for November 29, 2012. O'Reilly has not asserted that each time an employee takes sick leave, he or she receives separate checks for that pay period – one reflecting sick pay and one reflecting regular pay. The fact that a separate check was issued, with some haste, on November 30, 2012, could be exactly as innocent and inconsequential as O'Reilly contends. However, it also could support Severe's theory that his "official" termination date was November 28 and that O'Reilly then issued the separate check to support a story that the termination decision did not occur until after the loss prevention interview. This is a question for the jury.

***Statements by payroll employee.*** Next, Severe points to statements allegedly made by Debbie, an O'Reilly payroll employee whose last name is not known. Severe claims Debbie told him the termination date listed in the O'Reilly payroll system was November 28, 2012, which would further support his argument that the termination decision was

made before November 29, 2012. O'Reilly contends that this evidence is inadmissible hearsay that cannot be used to defeat a motion for summary judgment.

Without a showing that admissible evidence will be available at trial, a party cannot rely solely on inadmissible hearsay to overcome a summary judgment motion. *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1319 (8th Cir. 1986). "However, the standard is not whether the evidence at the summary judgment stage would be admissible at trial – it is whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) [emphasis original]. Severe states by affidavit that he had a history of working with Debbie on various payroll questions, that she was a person of authority within the O'Reilly payroll department and that she was able to speak on behalf of the corporation. For purposes of considering O'Reilly's motion, I find that Severe has provided sufficient foundation to show that the alleged statement by Debbie "could" be admissible at trial. The statement itself potentially falls within the "admission by party opponent" hearsay exclusion. *See* Fed. R. Evid. 801(d)(2). To the extent Debbie was relaying information contained in O'Reilly's business records, that information potentially falls within the "business records" exception. *See* Fed. R. Evid. 803(6).

I would not deny O'Reilly's motion if the alleged statement by Debbie was the only item of evidence Severe relied on to show pretext. Indeed, I am far from convinced that Severe will be able to establish the necessary foundation at trial to render the alleged statement admissible. At the summary judgment stage, however, I cannot find as a matter of law that the alleged statement is inadmissible. Thus, I find that it provides further support for Severe's argument that the decision to terminate his employment was made prior to November 29, 2012.

**Statements by Dube.** Severe argues that certain statements Dube made during the recorded loss prevention interview create a genuine issue of material fact regarding the timing and manner of the termination decision. Dube stated: "Barry [Sabor] wanted me to let you know that this decision probably won't happen tonight because Barry is not

going to make the decision by himself," and "Barry is not even making this decision on his own, Barry is going to go talk to some people and figure out what do we do to correct the problem." D. App. 174, 181. These statements, when viewed most favorably to Severe, provide substantial support for his argument that Sabor was not the sole decision maker. If accepted at face value, they show that Dube was not simply offering his own opinion or speculation as to how the decision would be made. Instead, he told Severe that Sabor "wanted [Dube] to let [Severe] know" that Sabor was not going to make the decision himself. This clearly implies that Sabor directed Dube to provide that information to Severe. Reasonable jurors could find that Dube's statements are contrary to O'Reilly's position that Sabor was the sole decision maker and acted without any input from Martin or others.

*Noncompliance with standard loss prevention investigation procedures.* During the loss prevention interview, Severe refused to provide a written statement regarding the Trickle Pay Arrangement. Dube told Severe he believed the normal procedure upon such a refusal would be for Sabor to suspend the employee without pay until a statement is provided. D. App. 179. However, Severe was discharged, not suspended. Sabor testified that while an employee's refusal to provide a written statement can influence the decision about what disciplinary action should be taken, such a refusal does not automatically result in termination. *Id.* at 269. Moreover, according to Sabor, when an employee admits a violation that will result in termination, the decision to terminate can be made without awaiting the employee's written statement. *Id.*

Severe argues, however, that O'Reilly acted in a manner inconsistent with its usual practices by discharging him before he provided a written statement. He further contends that this alleged inconsistency could support a reasonable juror's inference that the termination decision had already been made before the loss prevention interview and that the interview took place solely as a pretext. On its own, this evidence is very weak and would not support the denial of O'Reilly's motion. However, when combined with other

evidence discussed herein, it could add some support for an inference that O'Reilly's stated reason for discharge is pretextual.

**Statements by Sabor.** Finally, Severe points to Sabor's own admissions to support his theory that Sabor was not the primary decision maker. As noted above, Sabor testified that if the decision to terminate Severe's employment occurred prior to November 29, 2012, then someone other than Sabor made that decision. P. App. 41. When taken in the light most favorable to Severe, this testimony, in combination with the other evidence described above, creates genuine issues of material fact as to when the decision was made and who made the decision.

### b. Would Severe have been discharged solely because of the Trickle Pay Arrangement?

Severe also argues that the evidence shows O'Reilly would not have discharged him solely because of the Trickle Pay Arrangement but, instead, there must have been other motivating factors – such as his age. For example, he contends that his own supervisor knew of and approved the arrangement at its inception in 2004 and that a subsequent supervisor also knew of it, yet Severe was not discharged until 2012. According to Severe, this shows that the Trickle Pay Arrangement was used as a pretext for O'Reilly to end his employment while, in fact, age was the true motivation.

Severe also points to evidence that O'Reilly permits its managers to "bend the rules a little" in making "business decisions" to achieve successful objectives. Lewis testified that other District Managers may have violated company policy in making particular business decisions and that depending on the circumstances, a manager would need to make a judgment call about doing so. P. App. 74. Severe claims the Trickle Pay Arrangement was a justified, "bend the rules a little" business decision. He also argues that other managers have violated company policy without being discharged.

**Supervisors' knowledge of the Trickle Pay Arrangement.** Severe testified that in 2004, he alerted his then-supervisor, Alexander, that Trickle should receive a raise

because he had been offered a position with a competitor. P. App. 20. Severe claims Alexander attempted to obtain approval for a raise but was unable to do so, with Severe then employing the Trickle Pay Arrangement as an alternative. *Id*. Severe contends Alexander was aware of the pay arrangement and approved it. *Id*. at 21-22. Severe also contends that he discussed the arrangement with Alexander's successor, Harris. P. App. 21. Both Alexander and Harris deny that they had knowledge of the Trickle Pay Arrangement. D. App. 35, 250. Nonetheless, of course, I must accept Severe's testimony as true for purposes of O'Reilly's motion. Thus, I must assume that the Trickle Pay Arrangement was put in place with the approval of Severe's Region Director and that Severe then disclosed the arrangement to the next Region Director. This evidence, when combined with other evidence discussed herein, permits a finding that the Tickle Pay Arrangement was not the actual reason for Severe's discharge.

*The Ubben Pay Arrangement.* Severe contends that the Trickle Pay Arrangement was similar to a pay arrangement O'Reilly put in place for John Ubben and that no employee was discharged because of the Ubben arrangement. He claims that the circumstances of the Ubben arrangement show that Severe was not discharged because of the Trickle Pay Arrangement. The exact nature of Ubben's arrangement is in some dispute. Severe claims Ubben was an hourly employee but was paid for fifty hours of work per week, "regardless of the actual number of hours worked, plus mileage" and that Ubben did not punch a time clock as O'Reilly required of hourly employees. P. App. 28-29. O'Reilly claims Ubben actually worked fifty hours a week and had a manager record his time worked instead of punching a clock himself, making Ubben's pay arrangement distinct from the Trickle Pay Arrangement.

Clearly, there are differences between the two arrangements. Unlike Trickle, there is no evidence that Ubben routinely received pay for a substantial number of hours beyond those actually worked. However, it does appear that Ubben's arrangement was inconsistent with O'Reilly's policies in that he was an hourly employee but was not paid based on hours actually worked each week. While the Trickle Pay Arrangement arguably

constituted a more-serious violation, given its effect of paying Trickle double the number of hours actually worked, the inferences to be drawn from the distinction between the two non-conforming arrangements are for the jury to consider, not the court. Reasonable jurors could conclude that the Ubben arrangement, which did not result in the discharge of any O'Reilly employee, supports Severe's argument that O'Reilly's stated reason for termination is pretext for some other, discriminatory motivation.

### c. *Martin's alleged role*

Severe claims Martin was involved in the decision to terminate his employment. This contention is important because, as I noted earlier, Severe contends Martin was biased against older employees. It is undisputed that Martin recommended five other District Managers for promotion to Region Director positions during the relevant period of time and that they were, on average, about 18 years younger than Severe at the time of their respective promotions. O'Reilly denies that Martin considered age as a factor in making his recommendations. For purposes of its motion for summary judgment, however, I find that reasonable jurors could conclude otherwise. In addition to the undisputed age differences between Severe and those who did receive Martin's recommendations, Severe was on the "high potential" list while one of the five selected for promotion was not. Moreover, that same employee (Jim Belschner) was only 29 years old when promoted and had served as a District Manager for only 1.5 years. I cannot conclude, as a matter of law, that no reasonable juror could possibly find that Martin had a preference for younger employees.

If Martin was, in fact, involved in the decision to discharge Severe, then a past pattern of promoting younger employees over more-qualified, older employees would be relevant and indicative of an age bias. *See, e.g., Ridout*, 716 F.3d at 1086. To demonstrate Martin's alleged involvement, Severe relies primarily on a series of email messages between Martin and other O'Reilly executives. While I touched on some of those messages earlier, I will describe them in more detail.

On October 31, 2012, after Severe had declined Lewis's request that he temporarily manage the Storm Lake store, Martin sent an email to Jeff Shaw, O'Reilly's Senior Vice President of Sales and Operations, in which he stated that Severe "[g]ave his verbal notice today" and that Martin was "[w]orking with HR so that we handle the right way." P. App. 139. He further stated that Severe "refused to go and run one of his stores where a manager is resigning." *Id.* Martin sent copies of the email message to Lewis and to Jon Stahl, the Human Resources manager. *Id.*

That same evening, Lewis sent an email to Martin stating that after speaking with human resources, it was decided that they would contact Severe again the following morning. P. App. 140. Lewis suggested that Severe might "offer to give me a written resignation in the morning, which would wrap this up neatly." *Id.* Martin responded to Lewis by stating: "Just between you and me I bet he knows about your future plans and ours." *Id.*

Martin also had another email exchange with Shaw that evening. He asked Shaw: "So are you saying keep Steve [Severe]?" P. App. 142. Shaw responded: "We need to talk about it." *Id.* Martin then forwarded Shaw the prior email message from Lewis and advised Shaw: "This is part of a documentation process." *Id.*

Martin and Shaw then spoke by telephone about Severe, although the precise date is not known. Next, another series of email messages was exchanged on November 2-3, after Severe advised O'Reilly of his need for FMLA leave. The participants included Martin and Shaw, plus Henslee (O'Reilly's CEO), Wise (its COO) and Evans (an Executive Vice President). Henslee and Wise were included in the exchanges despite the fact that they would typically have no role in personnel decisions or leave of absence issues at the District Manager level.

Martin started the exchange on November 2 by advising the group of top O'Reilly executives that Severe was "considering resigning." D. App. 235. Martin then gave a brief overview of the situation involving the Storm Lake store, including Severe's statement that he would resign as opposed to running that store temporarily. *Id.* at 235-

36.  Wise responded on November 3 by asking Martin about Severe's job performance. *Id.* at 235.  Martin then described various alleged deficiencies in Severe's performance and stated:  "I really don't think his people respect him."  D. App. 234.  Martin further stated that Severe "has been going backwards for a few years now" and "I think it has became [sic] clear to him that he physically might not be able to do the job anymore." *Id.* at 234-35.  Severe denies that Martin's negative critique fairly or accurately depicted his job performance and notes that his most-recent performance evaluation, prepared by Lewis in March 2012, contained contrary information.  P. App. 130-37.  Severe also notes that Martin never recommended any corrective action with regard to the alleged deficiencies described in his November 3 email message.

Wise responded to Martin's critical comments about Severe by stating:  "Sounds like we will be better off if Steve decides to leave.  Hopefully we have a good replacement in the wings."  *Id.* at 234.  Henslee, the company's CEO, then responded:  "That's exactly what I thought after reading [Martin's] note."  *Id.*  Martin then forwarded the entire exchange to Lewis, with the comment:  "FYI."  *Id.*  Thus, on November 3, 2012, Martin informed Severe's direct supervisor that the organization's Chief Executive Officer and Chief Operating Officer each believed that O'Reilly would be "better off" if Severe decided to leave the company.

Viewing this evidence most favorably to Severe, reasonable jurors could conclude that Martin (a) created negative feelings about Severe among O'Reilly's top executives by providing an unfairly harsh assessment of Severe's performance and, then, (b) advised Lewis of those negative feelings so Lewis could act accordingly.  Reasonable jurors could further find it suspicious that just three weeks later, Lewis (at Martin's direction) initiated a loss prevention investigation about a pay arrangement that had been in place for eight years.  Of course, the jury does not have to make these findings.  Reasonable jurors may very well believe the testimony of O'Reilly's witnesses that the loss prevention investigation and the decision to discharge Severe were entirely separate from and independent of the events and communications that occurred a few weeks earlier.

I find, however, that reasonable jurors *are not required* to believe that testimony. Severe has produced evidence from which jurors could infer that Martin (a) had an improper bias against older employees and (b) influenced O'Reilly's decision to terminate Severe's employment. That is, there is "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. O'Reilly's motion for summary judgment on Counts I and II must be denied.

## B.   FMLA Discrimination

### 1.   Applicable Standards

The FMLA entitles an eligible employee to twelve weeks of leave during any twelve-month period if he or she has a serious health condition that makes the employee unable to perform the functions of the employee's position. *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 923 (8th Cir. 2014). A FMLA discrimination claim arises if an employer takes adverse action against an employee due to the employee's exercise of rights under the FMLA. *Id.* "However, an employee who requests FMLA leave has no greater protection against termination for reasons unrelated to the FMLA than he did before taking the leave." *Id.*

Absent direct evidence of discrimination, an FMLA discrimination claim is evaluated under the *McDonnell-Douglas* framework. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007 (8th Cir. 2012); *see also Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008). To establish a prima facie case of FMLA discrimination, a plaintiff must show that (1) he exercised rights afforded by the Act; (2) he suffered an adverse employment action; and (3) there was a causal connection between his exercise of rights and the adverse employment action. *Ebersole*, 758 F.3d at 924. To show a causal connection, the plaintiff must only should that his exercise of FMLA rights "played a part" in the employer's decision. *Pulczinski*, 691 F.3d at 1007; *See also Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 963 n. 3 (8th Cir. 2012).

"Evidence that gives rise to 'an inference of a retaliatory motive' on the part of the employer is sufficient to establish a causal link." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (quoting *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002)). Such evidence may include the timing of the protected activity and the subsequent, adverse action. *Id.* Timing alone, however, is rarely sufficient to establish the causation element. *Id.* For temporal proximity to support an inference of causation without corroborating evidence, the proximity between the protected activity and the adverse action must be extremely close. *Id.*

### 2. Discussion

Severe argues his FMLA leave was the final straw for Martin and motivated him to cause the termination of Severe's employment. He contends that he meets the first two elements of the prima facie case for FMLA discrimination because (1) he exercised his right to take FMLA leave and (2) he was terminated less than thirty days later, while still on leave. He claims there is sufficient evidence to generate a genuine issue of material fact as to whether there was a causal connection between his FMLA leave and the termination decision. Specifically, he argues that the email messages Martin sent to O'Reilly's top executives and the proximity of Severe's discharge to the commencement of his FMLA leave constitute sufficient evidence to generate a fact issue as to whether his FMLA leave played a part in O'Reilly's decision.

Severe notes, for example, that after he told Lewis and Martin he would need to take leave, Martin used Severe's medical leave to suggest to O'Reilly's senior management that Severe was physically unable to continue as the District Manager. D. App. 235-236. Severe further points out that after learning of Severe's alleged physical limitations, as well as Martin's accusations of poor performance, O'Reilly's top executives determined that O'Reilly would be "better off" without Severe. *Id.* at 234. As noted above, Martin then forwarded the entire email chain to Lewis as an "FYI." *Id.*

Severe was discharged less than one month after he first advised O'Reilly of his need to take medical leave.

As with Severe's age discrimination claim, reasonable jurors could reject Severe's theory and believe O'Reilly's witnesses. In that case, of course, the jury would find that the discharge decision was made solely by Sabor and solely because of the Trickle Pay Arrangement. Again, however, the jury is not required to make that finding. Severe has produced sufficient evidence to allow an inference that Martin influenced the termination decision and that Severe's FMLA leave "played a part" in that decision. As such, O'Reilly's motion for summary judgment on Count III must be denied.

## VI. CONCLUSION

For the reasons set forth herein, the motion (Doc. No. 22) for summary judgment filed by defendant O'Reilly Automotive Stores, Inc., is **granted in part** and **denied in part**, as follows:

a. The motion is **granted** with regard to Severe's claim for interference with FMLA rights, as described in Count III of the amended complaint. That claim is hereby **dismissed**.

b. The motion is **denied** with regard to all other claims. Trial will proceed as scheduled, beginning May 4, 2015, on Counts I and II, along with the portion of Count III that alleges discrimination in violation of the FMLA.

**IT IS SO ORDERED.**

**DATED** this 23rd day of March, 2015.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE